In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00283-CR
_____

RONALD WAYNE SCHUBERT, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

**On Appeal from the 359th District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-07-08807-CR**
_____

**MEMORANDUM OPINION**

A jury convicted Ronald Wayne Schubert of the first-degree felony offense of

murder of Jeffrey Taylor, Jr., rejecting his self-defense claim. In a special issue, the

jury found that the offense was the result of sudden passion and assessed punishment

at three years of confinement. The trial court sentenced Schubert accordingly.

Schubert challenges his conviction, and in a single issue argues that the State failed

to prove beyond a reasonable doubt that he did not act in self-defense. For the following reasons, we will affirm the trial court's judgment.

## BACKGROUND AND TRIAL EVIDENCE

### Testimony of Christopher Evans

Christopher Evans is currently a patrol sergeant with the Montgomery County Sheriff's Office (MCSO) but was previously a homicide detective for MCSO and the lead detective on this case. He described his law enforcement training and experience for the jury. Evans described his job as going to the scene, collecting facts, and presenting them to the district attorney's office.

On July 24, 2020, his partner contacted him about a shooting that occurred in a shopping center parking lot with a deceased person at the location. He outlined the steps he took after he was contacted, including speaking with his supervisor and the Texas Rangers. Evans testified that Ranger Chris Perkins accompanied him in this investigation. Evans explained that he also contacted the DA's office, because they took a multi-disciplinary approach. Once he contacted those individuals, he went to the scene.

Evans said he arrived at the scene at 6:18 a.m., and multiple deputies were there with Taylor's body in the parking lot. Evans testified that when he arrived, he talked to the sergeant on the scene and had "a very base level" of detail about what happened and was informed that Taylor, the decedent, attacked a security guard and

2

was shot. Schubert worked for Enforce, a security company, and was on duty as a security officer at the location where the shooting occurred, working a 9 p.m. to 5 a.m. shift. At the scene, he observed Schubert's injuries, the location of the vehicle, and where the incident occurred. He also assigned tasks to people, including having other detectives download the deputies' body-worn cameras before he spoke with Schubert.

During his testimony, several photographs of the scene and Taylor's body were shown to the jury, which Evans discussed. He explained that certain photos showed taser probes on Taylor that had been fired by MCSO deputies Kern and Ellis. He also discussed another photograph shown to the jury that showed a gunshot wound in Taylor's bicep, which told Evans that Taylor was hit in the arm, and from the level of swelling, the bone was likely injured. Additional photos were shown to the jury and discussed by Evans showing injuries and abrasions on Schubert's body, which Evans characterized as "[n]ot severe." Evans said Schubert had redness to his face, swelling to the back of his head, red marks on his elbow, and complained that his head hurt. Evans also agreed that it appeared Schubert had been struck in the face. Evans said that he had investigated cases where the impact of someone's head on the ground or with something else had seriously injured the person and agreed a person could die from those types of injuries. He testified that injuries are relevant to determine whether self-defense was a factor.

3

Evans testified that Schubert consented to an interview, which occurred in Evans's vehicle in the shopping center parking lot and Evans recorded the interview. A portion of Evans's interview with Schubert was played for the jury. Evans testified that in that interview, Schubert never articulated he was protecting the deputies, which is relevant because part of using deadly force is "you have to be protecting yourself or others from serious bodily injury or death." According to Evans, Schubert did not state that he believed the deputies were in danger; "[a]ll he said was he was scared." Evans testified it was implied that Schubert was scared "for himself[,]" and he understood based on the defendant's position, "it sounds like it could be a case of self-defense." Evans knew there was more evidence he needed to look at though, including the deputies' body cameras and the dash cameras, which would either corroborate Schubert's story or show something else.

Evans summarized Schubert's story about the shooting,

> Mr. Schubert stated he was a security guard assigned to that post. He saw a deputy following Mr. Taylor. He didn't know the male at the time, but Mr. Taylor. And he intercepted Mr. Taylor, got out, told Mr. Taylor to stop. Mr. Taylor attacked him with his fist. He didn't have any weapons, just fist. And either Mr. Schubert was knocked to the ground or fell to the ground during the altercation. Mr. Schubert basically stated he – that Mr. Taylor came at him. He fired one time in the center mass. It didn't stop Mr. Taylor, so he fired a second time.

4

Schubert's version of events essentially was that Mr. Taylor came at him, so he shot him. Schubert's story for the second shot was Taylor came at him again, so he shot Taylor again.

Despite Schubert telling Evans he was "fuzzy," he provided a detailed version of events. He testified that Taylor assaulted Schubert unprovoked. Evans agreed that when Schubert exited his vehicle, he put his arm up rather than pull out his baton, and he did not have a taser, although the tasers did not stop Taylor. Evans said that Schubert told him that when he approached the deputies that morning, it had nothing to do with Taylor; instead, he planned to show them that the lights on his security vehicle had been fixed. Evans disagreed that Schubert did not try to escalate the situation and stated that "he interjected himself in a law enforcement matter[.]" Evans also testified that deputies gave Taylor commands, but Taylor did not comply, yet Schubert did not intercede, and at some point, deputies tased Taylor. Schubert did not shoot until after the second taser was deployed, and the deputies had no more taser cartridges. Evans testified the deputies were justified in using their tasers.

He also agreed all the deputies said in their statements that Schubert did not provoke the fight. Evans testified that only after Taylor flexed and moved toward the deputies, did Schubert shoot the first time. Schubert's first shot was not fatal, and Taylor began to spin around and was not complying with the deputies' commands to get down.

5

Later that morning, after speaking with Schubert, Evans reviewed the bodycam videos. Evans explained that when Schubert told him what happened, Evans thought the shots were in quick succession, but when he watched the video, they were not. He testified that twenty-one seconds was how long it took to aim and shoot the first time, and eleven seconds elapsed between the first and second shot.

Evans also noted the lack of severe injuries and that when the shots occurred, Taylor was not posing a physical threat of serious bodily injury or deadly force to any person. He also distinguished between a threat, explaining that "someone verbally threatening you or just physically posturing. It's not the actual attempted or use of force." Evans explained that "when you have attempted and use, . . . it's someone actually using the force against someone else or attempting to use the force against someone else." Even if Taylor started the physical altercation, when Schubert shot him, Taylor "was not posing any kind of threat. He was not attempting to use or using deadly force or serious bodily injury toward any person." Evans testified that based on the timeline in Schubert's statement, it was inappropriate for Schubert to pull his pistol when he hit the ground but not unlawful since "he had just been assaulted and he was trying to keep Mr. Taylor from assaulting him again."

Later, after watching the videos multiple times, law enforcement decided the shooting was not justified, and Schubert should be arrested and charged with murder. Evans discussed the bodycam and dashcam videos during his testimony, which were

6

played for the jury. Evans said the videos show Deputy Kern following Taylor and trying to get him to stop, but you can see Schubert intercept Taylor, and their altercation ensues. It also showed when Schubert had his pistol out. Evans said that Ellis's bodycam and dashcam footage showed the events from a slightly different angle, which was valuable.

Evans testified that on the video, Ellis commented that "he was thankful that [Taylor] didn't come to them. And he stated if he would have come at us, we would have no choice but to shoot him as well." Regarding Ellis's comments, Evans felt Ellis was incorrect. Evans testified that if deputies had done so, "[i]t would have been an unjustified use of deadly force." He explained that deputies had the option of using their hands and fighting Taylor, which they should have done since "it was not a lethal force situation." This was because when Taylor was shot, "there was no serious bodily injury or imminent fear of serious bodily injury or death being caused to anyone." Ellis makes two more comments on the video, but Evans maintained the deputies' shooting would have been unjustified, and he would have filed charges with the district attorney's office had they done so.

Evans testified that when Schubert fired the shots, Taylor was not a threat to him since Taylor did not display a weapon, and he focused on the deputies, although Evans agreed that Taylor was not under control. When he fired the shots, Schubert was not being assaulted and was not in imminent danger of a head injury. Evans

7

testified that when Schubert used deadly force, he was not being beaten. Rather, Taylor's attention was focused on the deputies, and he even took a step towards them instead of Schubert when the first shot was fired.

Another video from Deputy Inmon's bodycam was played, who said that Schubert helped the deputies. On the video, Inmon said a deputy would have had to shoot Taylor, but Evans disputed this. Evans noted that Inmon was not at the scene and was only going off what the other deputies told him.

**Testimony of Nathan Kern**

Nathan Kern testified that he currently works for the MCSO as an instructor in the training academy but previously worked as a patrol deputy. Kern described his duties as a patrol deputy. He also outlined his experience and training, which included training in the use of deadly force.

On July 24, 2020, Kern was patrolling and working from 6 p.m. to 6 a.m. Kern testified that while patrolling, at about 4:48 a.m. on July 24, he saw a man, who he later learned was Taylor, running across the road, "acting in an erratic manner[,]" and into a shopping center parking lot. In the parking lot, the man screamed loud enough that Kern heard him through the rolled-up windows of the patrol vehicle, "and he was waving his arms and hands up in the air." Kern believed Taylor was having a mental or medical episode or might be on something.

8

Kern contacted dispatch for an additional unit to assist. He said he was not trying to arrest or detain Taylor but trying to help him. Kern followed Taylor through the parking lot and stepped out of his car to get Taylor's attention but was unsuccessful, so Kern got back in his car and continued following him. Kern testified that during this time, he saw Taylor's hands, and besides a cell phone that Taylor dropped, there was nothing in his hands. Kern had his takedown light on for better visibility but did not activate his red and blue lights or the siren. Taylor did not comply with Kern's request to stop.

Kern testified that as he continued following Taylor through the parking lot, a security company vehicle pulled up, but he did not ask anyone from the security company to intervene. He said that Schubert stepped out of the security vehicle and approached Taylor. Schubert then stepped to the rear of his vehicle and "put his hand up in a stop motion" to Taylor, which agitated Taylor. Kern testified that they "became engaged in the beginnings of a physical altercation." He described Taylor's swinging his arms at Schubert, and "Schubert[']s putting his arms up in a defensive manner[,]" then Schubert fell to the ground. During the altercation, Kern saw nothing in Taylor's hands. Kern agreed the assault was a fist fight, and it appeared Taylor pushed Schubert to the ground.

Kern said he then intervened and attempted to tase Taylor. Kern explained that Schubert's intervening escalated the situation which required Kern to intervene,

9

but Kern did not want to. Up to that point, Kern's plan was to have other units assist, contact Taylor, and help. Even so, he said that Taylor escalated the situation by striking Schubert. Kern testified that he unsuccessfully tased Taylor to stop the altercation. Before tasing him, Kern warned Taylor, and Taylor turned towards Kern and said something. At that time, Deputy Ellis arrived on the scene, and Kern told Ellis to tase Taylor, which he did. By the time Ellis arrived, they did not have control of the situation. Kern testified that he felt justified in using the taser, because Taylor was a threat to him and Schubert. After Ellis deployed his taser, Taylor rolled on the ground, causing Ellis's taser wires to pull out, which rendered it ineffective.

After the taser wires pulled out, Taylor stood up and faced Kern and Ellis, then "made a loud, audible scream or yell[,]" but still had nothing in his hands. Taylor then stepped toward Kern and Ellis and "did a flex motion[,]" but he was not running at them and had no weapons. Although he characterized the sounds Taylor made as aggressive. During this time, Kern focused on Taylor and not Schubert. After the tasers were fired, Taylor was focused on the deputies.

After the second taser was ineffective, Kern pointed his firearm at Taylor but did not shoot. Kern explained he "was not justified at the time to shoot him[,]" and Taylor "was not a deadly threat to me at the time." Kern testified that there are times in law enforcement you draw a weapon but do not shoot to demonstrate you may use it, if necessary, but here it did not become necessary. Kern agreed that by showing

10

the firearm, they "showed deadly force." Kern said he did not fire his pistol after the assault ended, because Taylor "wasn't a deadly threat to me at the time[,]" nor was he a deadly threat to Schubert at the time.

Kern testified that before the first shot, while deputies tried to create distance to give Taylor a chance to comply, Schubert was on the ground and not as mobile as the officers. Kern explained that after Taylor stepped in the deputies' direction, they "took a few steps back to create distance," and Schubert fired one shot that struck Taylor in the left bicep. He also testified that he did not think shooting Taylor was necessary. Kern said that when Taylor was shot in the left arm, he reached around with his right arm and grabbed his left arm, "then made several stagger steps in a circular-type motion and, kind of, bent over at the waist." The taser wires also wrapped around his feet and ankles. Kern testified that Taylor was seriously wounded.

After the first shot, Kern and Ellis continued giving Taylor verbal commands to get on the ground, and Schubert fired a second shot. Kern explained that although he did not know immediately, through the investigation he learned that the second shot hit Taylor in the neck. Kern testified he did not believe the second shot was justified given the time lapse between shots and Taylor's actions at the time of the second shot. Kern explained that when the second shot was fired, Taylor "was a

11

threat to no one[,]" because "[h]e was just standing, holding his arm in pain, spinning in circles."

Kern explained he placed handcuffs on Taylor as a function of his training, and it was hard to shift gears given the stress and adrenaline. He also explained the deputies' comments on the video that if Taylor had charged them, it would have been the same outcome. Kern testified that they were "in a stressful environment[,]" but if they acted on those comments, "it would have been unjustified[.]"

At various points in Kern's testimony, his bodycam video was played for the jury and discussed. Kern testified that the videos, rather than written statements, were the better representation of events.

**Testimony of Todd Ellis**

Todd Ellis testified at trial that he works patrol for the MCSO. Ellis described his duties as a patrol deputy, his experience, and his training, which included using force and deadly force. On the night of the incident, Ellis was working the 6 p.m. to 6 a.m. shift. About 5 a.m., he heard a radio dispatch about Kern's seeing a suspicious male, so he drove to Deputy Kern's location.

When Ellis arrived, he observed Taylor assaulting Schubert by "throwing multiple strikes with what appeared to be a close[d] fist[,]" around Schubert's "head, upper body area[.]" Ellis testified that from his angle, it appeared as if Taylor made contact. Ellis said he parked his patrol vehicle and went towards Kern, Schubert, and

12

Taylor. He heard Kern say to tase Taylor. He knew that Kern had already deployed his, and Ellis then deployed his taser. Ellis could not see whether Kern's taser struck Taylor, but he saw it was ineffective. He testified they were justified in tasing Taylor since he was assaulting someone.

Ellis testified that he tased Taylor rather than shooting him, "[b]ecause I wouldn't have been justified in shooting at that point in time[,]" because Taylor "hadn't attempted to use . . . deadly force on anyone on the scene." Ellis explained that he tried to use the least amount of force necessary to gain Taylor's compliance, so they could help him. Ellis agreed that when he arrived, Kern tried to get control of the situation, and things unfolded quickly. Ellis also testified that Schubert was older, but Taylor was in his mid to late thirties. He agreed a blow to the face or a strike with the hand could result in serious bodily injury or death.

Ellis's taser was initially effective, but Taylor began yelling and rolling on the ground away from him, and the cables disconnected from the taser, rendering it ineffective. Ellis said that once the taser became ineffective, he took a few steps toward Taylor, who got off the ground. At that point, Ellis "backed up to give space[]" and drew his firearm. Ellis testified he did not see that Taylor had any weapons, so he drew his gun and gave verbal commands to gain Taylor's compliance. He said he did not shoot, because deadly force was not justified at that time.

13

Ellis explained that after the deputies backed up, Taylor "took a couple of steps in our general direction . . . and begins growling, hollering, and flexing," but did not respond to their commands. Ellis felt justified in showing deadly force but not using it. On video, Ellis was heard saying that he "went deadly" which he explained as drawing his gun and pointing it at Taylor, actions Ellis believed were necessary under the circumstances. After Taylor assaulted Schubert, despite deputies' verbal commands, tasers, and drawing weapons, Taylor did not comply. Ellis testified that Taylor's attitude and aggression, along with his arm movements, were important factors for him. Ellis also testified that when he said "I was hoping he was going to stop because we had nothing left but deadly," on the recording, he was playing out circumstances and hypotheticals, but they were not there yet.

During Ellis's testimony, portions of his bodycam footage were played, which he discussed for the jury. Ellis testified that as Taylor walked towards the deputies, it appeared Schubert discharged his firearm in Taylor's direction, and you could see Taylor bend over, possibly holding his arm. He explained, "I wouldn't have been justified in firing at that point in time[,]" since "Taylor had not presented or attempted to use deadly force on anyone, ourselves, or Mr. Schubert at that time." Ellis saw Taylor spinning around multiple times, because he was injured. Then, the second shot was fired by Schubert.

14

Ellis learned during the investigation the first shot hit Taylor's arm, and the second shot hit Taylor in the throat. Ellis said that Schubert was not justified in shooting Taylor when he fired the first shot since Taylor had not used deadly force on anyone nor inflicted serious bodily injury, and Taylor was not threatening anyone with a weapon. Taylor also was not doing any of those things when Schubert fired the second shot. Ellis explained that Taylor fell to the ground right after the second shot. Although they handcuffed Taylor, Ellis agreed he was no longer a threat, given his injuries; he was no longer a suspect and instead was "the victim."

As to the comments that he and other officers made after the shooting that if Taylor kept coming at them, the result would be the same, Ellis explained that he played out "every worst-case scenario" if Taylor ran at them, given his altered mental state and aggression. Nevertheless, Ellis testified that they "weren't there yet[,]" and he would not have shot Taylor, because it would not be justified. Ellis believed that if Schubert had not inserted himself into the situation, it could have come out differently.

**Testimony of Paul Hahs**

Lieutenant Paul Hahs with the MCSO testified that he is over the training academy. Previously, he worked as a detective in the homicide division for sixteen years, and the last six of those, he was a sergeant. When this incident occurred, Hahs was a sergeant in the homicide unit, and Evans was a detective he supervised. Hahs

15

described his experience investigating use-of-force cases and detailed his use-of-force training. He had reviewed several officer-involved shootings during his career. Hahs testified that this case was treated like an officer-involved shooting.

Hahs testified Texas has two types of force, non-deadly and deadly. Deadly force is an action that can cause serious bodily injury or death. Hahs explained that when reviewing use-of-force situations that he is looking for "is would a reasonable person in this situation at this specific time feel that it is absolutely necessary to take this action." Hahs testified that use of deadly force is not authorized in response to regular force alone; there are times when one would be justified using regular force in response but not be justified using deadly force.

Hahs reviewed this case, and based on the totality of the circumstances, the use of force may have been justified, but he believes deadly force was never justified in this case. The officers make that decision at the moment the force is used but consider what led up to this and what might reasonably happen. Detective Hahs discussed a timeline demonstrative of events. According to Hahs, when the officers tased Taylor and when he was striking Schubert, Taylor was only using non-deadly force. He testified that Taylor did not jump on Schubert and slam his head into the pavement; had Taylor done so, it would change the level of force. Hahs characterized the level of force used by Taylor from the time of first contact through Schubert's falling to the ground and drawing his pistol as "[n]on-deadly force." During this time,

16

Schubert and the deputies were justified in using non-deadly force against Taylor, but deadly force was not justified. Hahs said that the statutes allow the display or threat of deadly force, but not the actual use of deadly force to stop an unlawful assault, and Taylor committed an unlawful assault against Schubert. Schubert's tracking Taylor with his gun showed Hahs that Schubert knew exactly where Taylor was, and that Schubert was aware of what was happening around him. Hahs testified that based on the timeline, when Schubert aimed at Taylor, Taylor was not using any force but was a potential threat of non-deadly force.

When the first shot was fired, the deputies were giving verbal commands with their weapons out, and Taylor was posturing. Hahs explained that everyone was justified in displaying their weapons and showing Taylor deadly force may be used, but they were not justified in using deadly force. At the moment Taylor was first shot, he was not facing Schubert. Until then, Schubert committed no crime, but when he fired the first shot, he committed a criminal act. Hahs explained this was because Taylor had not escalated the situation to deadly force, and the only change from seconds before was that Taylor stepped toward the deputies and not in Schubert's direction. According to Hahs, Taylor's stepping forward towards the deputies did not justify the use of deadly force by anyone.

According to Hahs, between shot one and shot two, Taylor was no longer a threat, as he was tangled in the leads and spinning; he stopped his aggressive and

17

angry posturing, and "[i]t appears like he's trying to get away." As Taylor stumbled in circles, Schubert fired the second shot, striking Taylor in the neck; Taylor then continued spinning. Taylor was bent over at the waist holding his arm with his head pointed toward Schubert when the second shot struck him. Hahs opined that Schubert's using deadly force at this time was not authorized, because "Taylor wasn't doing anything to be a threat at all, let alone a threat of deadly force or serious bodily injury."

Hahs felt the eleven seconds that passed between the two shots was important and described that length of time in a shooting situation as "an eternity." Hahs later discussed another timeline exhibit, which showed that Schubert fired the first shot twenty-seconds into the incident and fired the second shot eleven seconds later. The only difference between shots one and two was that Taylor was spinning rather than walking or standing still. Hahs said if the deputies had used force at that time, it would not have been justified. Hahs explained that given the time gap, "you actually have two separate shootings[,]" with "two clearly distinct decisions to pull the trigger." He noted that "as the movements and the situation changes, the second shot is fired." The time from the first contact on video until the second shot is fired, less than a minute passes. Hahs believed that Schubert fired the second shot simply because Taylor was still standing.

18

Hahs testified that he disagreed with the deputies' comments at the scene that if Schubert had not shot, they might have had to. Hahs said he told them if they had fired the fatal shot, they would have likely been charged with a crime. He agreed the statute does not require that someone suffer serious bodily injury before they are justified in using deadly force. Even so, Hahs did not believe there was ever a point where deadly force was justified in this case. Hahs testified that only non-deadly physical force may have been justified during the incident.

**Testimony of Paramedic and Emergency Physician**

Jennifer Comp testified at trial and is a paramedic captain with the Montgomery County Hospital District. Comp outlined her duties as captain. She also described her education, training and experience for the jury.

On July 24, 2020, at 4:51 a.m., Comp was dispatched to the scene for a "penetrating trauma," which meant a shooting or stabbing. When she arrived at 5 a.m., one patient was on the ground bleeding from the neck, who was "pulseless and dead on scene." After dealing with that patient, they were asked to address a secondary patient. Comp testified that the first patient bled out, and an officer reported that the patient was shot, which fit what she saw at the scene.

During Comp's testimony, she discussed Taylor's and Schubert's EMS records. Comp testified that she found Schubert sitting at the scene, he walked to the ambulance, and they transported him to the hospital without life-threatening injuries.

19

Comp said that Schubert had "a few reported injuries[,]" including one to the back of the head, a scrape on his elbow, and knee pain. Schubert reported, "Guy attacked me. Knocked my ass to the floor and, bam we hit the concrete." The records suggested that the cause of Schubert's injury was being shoved to the ground. Schubert reported that he hit the back of his head on the concrete and was unsure whether he lost consciousness.

Comp noted that Schubert had normal awareness, motor skills, and the ability to communicate, and his blood pressure was elevated. She characterized Schubert's level of injury as "[m]inor." She explained that anytime there is a blow to the head, they recommend further evaluation at the hospital to rule out anything serious.

Matthew Rushing, an emergency physician with Memorial Hermann, also testified that he treated Schubert the morning of the incident. Rushing outlined his education, training, and experience for the jury. Rushing testified that Schubert arrived by ambulance and presented with abrasions to his head. Rushing evaluated him in the emergency department, and based on his injuries and symptoms, Rushing ordered CT and x-ray imaging. There were no significant findings of injuries on the imaging studies. The medical records indicated that they could neither confirm nor refute whether Schubert lost consciousness. Rushing said that although it is possible to suffer serious bodily injury from being pushed to the ground and hitting your head on concrete, he did not believe Schubert had serious bodily injury.

20

**Testimony of Patricia Bui**

Patricia Bui, a firearms and toolmark examiner with the MCSO Crime Laboratory, testified at trial. Bui described her educational background, training, and work experience. Bui began working for the MCSO Crime Lab in 2020 and is licensed with the Texas Forensic Science Commission as a forensic analyst in the firearms and toolmark disciplines. She testified that she examined Schubert's weapon and detected no malfunctions. Bui also noted that it required about seven pounds of pressure on the trigger to fire.

**Testimony of Sara Doyle**

Dr. Sara Doyle testified she works for Montgomery County Forensic Services as a forensic pathologist, investigating the cause and manner of death for individuals who die in Montgomery County. Doyle described her education and training for the jury. She performed Taylor's autopsy.

Doyle testified that Taylor suffered two gunshot wounds, one to the left arm and one to the neck area. She explained that the bullet to the left arm completely broke Taylor's humerus, and he likely "lost use of his left arm." Doyle felt the gunshot wound to the left arm was survivable with medical treatment. She testified the wound to Taylor's neck was not survivable. She described the damage and path of the second bullet to Taylor's neck, which tore through his windpipe and subclavian vein, entered the chest, then hit the upper and lower lobes of his left lung.

21

There was significant hemorrhaging with blood in his airway that could interfere with breathing. Doyle also stated that although she did not know if Taylor's face was "actually facing" the shooter, but "the person that shot him would have been in front of him."

Doyle discussed her autopsy report, which showed positive toxicology results for amphetamine, methamphetamine, Delta-9-Carboxy THC, and Delta-9 THC. She said that a person high on methamphetamine might be violent and act erratically. Doyle testified that Taylor's cause of death was gunshot wounds of his neck, torso, and left upper extremity, and the manner of death was homicide. She noted the gunshot wounds resulted in blood loss, and the blood in the airways caused decreased oxygen exchange.

**Testimony of Mark Wright**

Mark Wright, a crime scene investigator and latent print examiner for MCSO testified. Wright testified that he was the lead crime scene investigator in this case. He identified Taylor by using his fingerprints. Wright called two other investigators to the scene to help him collect evidence, which included taking photographs. He discussed various photographic exhibits taken at the scene that were admitted into evidence. Wright also described the evidence collected at the scene, including a collapsible ASP baton from Schubert and a knife from Taylor's pocket, among other things. Wright testified he prepared a crime scene reconstruction in this case and

22

explained how he did so. Wright testified that for the first shot, Schubert was twelve feet and six inches from Taylor. When he fired the second shot, Schubert was fourteen feet and six inches from Taylor.

**Testimony of Ronald Schubert**

Ronald Schubert testified in his defense. At the time of trial, he was sixty-six. He testified that he went through training in the 1980s and became a Level 3 Security Licenseholder; the training included use of force and firearms. After leaving Texas for a while, his license lapsed, but he recertified and eventually obtained his Level 4 Security License. He held that license when this incident occurred, and he worked for Enforce Security at the time.

The day of the shooting, he worked from 9 p.m. to 5 a.m. Schubert patrolled the shopping center alone. His job was to "cruise the property" and "prevent general mischief and mayhem[.]" He felt he had a good working relationship with the police officers that worked in the area.

When he first saw Deputy Kern that morning, Schubert was going to his personal vehicle to transfer his gear from the security vehicle to his car to prepare for his shift ending. When Schubert saw the deputy's car, he decided to drive over and show the deputy that he had the headlight fixed on the security vehicle.

As he approached the deputy's vehicle, it had the takedown lights on but not the red and blue flashing lights. When Schubert saw that, he thought the deputy was

23

looking for something. Schubert then saw a person take off jogging when the officer's lights illuminated him, so he "begrudgingly thought" he could help the officer. He explained he was torn between helping and going home, but he was still on duty. As Schubert drove across the parking lot toward the person, he activated the security vehicle's red and blue lights.

At the time, Schubert was wearing a security belt with his firearm, extra magazines, a flashlight, and a collapsible baton. Schubert said that when he exited his vehicle, Taylor was not doing anything wrong, so he did not view him as a threat. Schubert testified that he only told Taylor to stop. Schubert testified that when he did, Taylor "looks me dead in the eye and he just rolls into me and runs through me. And he spins me around. And when I'm facing the opposite direction, he attacks me." Taylor then began swinging at Schubert. Schubert said he turned around, hoping Taylor would run away, he was sixty-three and wearing twenty pounds of gear, so was unable to chase Taylor. Schubert said all he could do was put his hands up to try to protect himself, because Taylor "would not stop."

At some point, Schubert grabbed Taylor's shirt, and did not know what happened, because the next thing he knew, he was "waking up on the concrete" and "looking at the stars." When Schubert fell back, he hit his elbow, right shoulder, and back of his head on the concrete. Schubert did not remember if he lost consciousness but "woke up" and things were happening. He heard screaming and tasers going off.

24

Schubert explained that his head was throbbing, he heard screaming, he had difficulty getting up, and he was "scared half to death[]" that Taylor might try to hit him again or take his gun. Schubert testified when he woke up, he was fuzzy, and the police officers were unsuccessfully trying to subdue Taylor.

Schubert said that he heard the taser go off and then screaming that the taser was not working. That seemed to be true, because Taylor was "still up and mobile." Schubert said Taylor was "going nuts," "out of his mind," "was screaming," and "it was scary big time." Schubert testified that the officers unsuccessfully tried to subdue Taylor, and he was on the ground hurt, had been beaten once, and did not want to get hit again, so he pulled out his gun. Schubert did not believe pulling out the baton would help. Given Taylor's behavior, Schubert did not believe he was less of a threat during the entire period. Schubert gave three reasons for why he pulled his gun: (1) deputies could not control Taylor; (2) it seemed he was more agitated and threatening; and (3) Schubert was still on the ground.

Schubert said he decided to fire his weapon, because he was afraid Taylor was coming back to "finish what he started" and "[b]eat my head into the concrete." He also felt Taylor was a threat to the officers, and it seemed he was walking that way. Schubert thought Taylor moved in his general direction, so he decided to fire the first shot. Schubert testified, at that moment, based on the events leading up to it and since officers could not control Taylor, he was in fear of serious bodily injury or

25

death and feared the same for the officers. Schubert never saw a weapon in Taylor's hands and did not know if he had one. Schubert testified that when he fired the first shot, there had been recent physical contact, but it was over "for the moment[,]" and Taylor was unarmed. Schubert asserted that when he fired the first time, Taylor was looking at him.

After the first shot, Schubert did not know if he hit Taylor. Even so, he said that when he fired the first shot, Taylor stopped coming at him. Schubert testified that when Taylor began spinning around, he seemed more agitated and went after the police officers. After Taylor moved in the direction of the officers, Schubert said he made "a turn towards me the second time." Schubert decided Taylor was a threat and coming back, so he fired his weapon again.

Schubert agreed the shootings were two separate uses of force. When asked if he agreed with the videos and pictures that Taylor was bent over when he shot the second time, Schubert responded, "I don't remember what stature he was when I fired." Schubert agreed the second shot killed Taylor but disagreed that Taylor was wounded and no longer aggressive. Schubert felt that because Taylor was facing him, he had the right to shoot him, since he viewed Taylor as a threat. Schubert testified that a reasonably prudent person in his situation would have pulled the trigger both times.

**Additional Evidence**

Bodycam and dashcam video from both deputies, along with Evans's audio recorded interview with Schubert was admitted as evidence. The video recordings captured the events immediately before, during, and after the shooting and were played repeatedly at trial for the jury. Video showed Taylor running through the shopping center parking lot waving his arms in the air and screaming as Kern approached him and tried to get him to stop. Video evidence also showed Schubert pull up in his security vehicle and the altercation between Schubert and Taylor. The video also shows the deputies attempting to get Taylor to comply, but he refused to follow commands, then the deputies deploying their tasers unsuccessfully. The videos show Taylor walking towards officers, who had their weapons drawn and were walking backwards as Schubert fired the first shot, then Taylor bent over grabbing his arm and spinning. The videos also show the second gunshot being fired about eleven seconds after the first while Taylor was spinning in circles. After the second shot, Taylor is seen spinning a few more times, then falling to the ground, where he remained. After the second shot and he was on the ground, video showed that deputies handcuffed Taylor. Officers are heard on the video stating they might have had to shoot Taylor if Schubert had not done so.

Additional evidence included, among other things: photographs of the scene and Taylor; Schubert's medical records; autopsy report; firearms ballistics report; a

timeline of events showing the length of time between shots; autopsy photographs; diagrams of the scene; photographs of Schubert's injuries; and photographs of a knife found in Taylor's pocket.

**Motion for Directed Verdict**

At the close of the State's case, Schubert moved for an instructed verdict and argued there was insufficient evidence. The trial court denied the motion.

**Guilty Verdict and Punishment**

The jury found Schubert guilty of murder as charged in the indictment. After the punishment hearing, the jury made an affirmative finding on the special sudden passion issue and assessed punishment at three years of confinement. The trial court sentenced Schubert accordingly.

**STANDARD OF REVIEW AND APPLICABLE LAW**

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See*

28

*Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16–17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted); *see also McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See id.* § 9.02. Self-defense is one type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he

29

reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). "Deadly force" is defined as "force that is intended or known by the actor to cause, or in the manner of its intended use is capable of causing, death or serious bodily injury." Tex. Penal Code Ann. § 9.01(3). "[R]easonable belief" is a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(42).

> As for the defense of justification,
>
> a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). In reviewing a challenge to the sufficiency of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would

30

have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914 (citations omitted); *see also Braughton*, 569 S.W.3d at 609 (citation omitted). Self-defense is a fact issue the jury determines, and it is free to accept or reject any defensive evidence on the issue. *See Saxton*, 804 S.W.2d at 913–14. A jury's guilty verdict constitutes an implicit finding that it rejected the defensive theory. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14.

## ANALYSIS

In his sole issue, Schubert complains the evidence was insufficient to show that he did not act in self-defense, particularly when considered from his perspective at the time of the incident and that the assault by Taylor could cause serious bodily injury. The State responds that when the evidence is viewed in the light most favorable to the jury's finding, Taylor never attempted to use deadly force, and evidence supported a finding that Schubert's belief that deadly force was immediately necessary, if credible was unreasonable.

The evidence showed Taylor acting erratically before the shooting, that he assaulted Schubert, that he refused to follow commands, and tasers were ineffective in securing his compliance. Schubert testified that he was scared and that he was afraid Taylor would return and finish the job. Even so, the evidence also showed that two police officers were on the scene, Taylor was unarmed, and when the first shot

31

was fired, Taylor focused on the officers and was not moving toward Schubert. The evidence also showed that this incident involved two shootings separated by eleven seconds: (1) the first shot which hit Taylor in the arm; and (2) the second shot that inflicted the fatal wound. When the fatal shot was fired, Taylor had been hit in the arm, was bent over, clutching his arm, and spinning in circles.

Viewing the evidence in the light most favorable to the jury's verdict, the jury could have determined that Schubert used deadly force by firing the second shot, and that such force was unreasonable. *See Jackson*, 443 U.S. at 318–19; *Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 609; *Hooper*, 214 S.W.3d at 13. Since self-defense is a fact issue the jury determines, the jury was free to accept or reject any of Schubert's defensive evidence on the issue. *See Saxton*, 804 S.W.2d at 913–14. Although the jury is to view the evidence from the defendant's perspective, the defendant's belief must be reasonable that deadly force was immediately necessary. *See* Tex. Penal Code Ann. §§ 9.31(a), 9.32(a); *Gamino*, 537 S.W.3d at 510. The jury was free to weigh the evidence adduced at trial, which included evidence that Taylor was not walking toward Schubert when either shot was fired, that Taylor was focused on the officers when the first and second shots were fired. *See Metcalf*, 597 S.W.3d at 855. We do not substitute our judgment for the factfinder's. *See Williams*, 235 S.W.3d at 750.

32

The jury's guilty verdict constitutes an implicit finding that it rejected Schubert's self-defense theory. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. After viewing all the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and found against Schubert on the self-defense issue beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. We overrule Schubert's sole issue.

## CONCLUSION

Having overruled Schubert's sole issue, we affirm the trial court's judgment. AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on May 20, 2025
Opinion Delivered September 17, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.